RENDERED: JUNE 16, 2016
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2014-SC-000488-MR

DATE 7-7-16 Dust Grown P.C.

DAVID A. CALHOUN APPELLANT

ON APPEAL FROM FRANKLIN CIRCUIT COURT
V.  HONORABLE PHILLIP J. SHEPHERD, CHIEF JUDGE
NO. 14-CR-00114

COMMONWEALTH OF KENTUCKY APPELLEE

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

### AFFIRMING

A circuit court jury convicted David A. Calhoun of first-degree sexual abuse and first-degree sodomy and recommended thirty years' imprisonment. Calhoun appeals the resulting judgment as a matter of right,[1] presenting two grounds supporting reversal of the judgment.

First, Calhoun argues that he was denied his right to conflict-free counsel when the trial court denied his motion to disqualify the entire Commonwealth's Attorney's office from prosecuting the charges against him after his former counsel withdrew from his representation before trial and took a job as an assistant prosecutor in the same Commonwealth's Attorney's office. Second, he argues that the trial court erred when it declined to admonish the jury to disregard certain questions posed by the Commonwealth in cross examination of a defense witness. We find no error in either of these rulings by the trial court and affirm the judgment.

---

[1] Ky.Const. § 110(2)(b).

# I. FACTUAL AND PROCEDURAL BACKGROUND.

Six-year-old Rachel[2] was Calhoun's stepdaughter. Her mother left Rachel at home with Calhoun while she went shopping. Calhoun allegedly took Rachel into his bedroom where he forced her to perform oral sex on him and warned her not to tell anyone about the incident.

When Rachel's mother returned home, Rachel told her something had happened while she was gone. Rachel's mother called Rachel's biological father. Rachel, her mother, her father and her stepmother all met in in a local park to discuss the situation. At the park, Rachel took a walk with her stepmother and told her what happened.

Upon hearing the report from the stepmother, Rachel's mother immediately informed the police. The account Rachel eventually gave to police was consistent with the account she had given in the park. Calhoun denied the allegations and insisted Rachel had fabricated the whole story, claiming that she was coached by her stepmother.

The original indictment charged Calhoun with first-degree attempted sodomy, first-degree sexual abuse, and being a second-degree Persistent Felony Offender. Before trial, Calhoun and the Commonwealth agreed to allow Rachel to testify by videotape to be presented at trial. Rachel testified that she actually performed oral sex on Calhoun; Calhoun touched her above her waist, on her belly, and on her chest; and the computer in Calhoun's room was displaying pornographic images at the time. After this testimony came to light, the Commonwealth chose to seek Calhoun's re-indictment on more serious charges. The grand jury returned a new indictment charging Calhoun with

---

[2] Rachel is a pseudonym for the victim.

2

first-degree sodomy, first-degree sexual abuse, and unlawful use of an electronic device to induce a minor to engage in sexual acts.

At trial, Rachel's mother testified that she did not think Calhoun committed the alleged acts. In her view, Rachel was not questioned in a manner conducive to eliciting accurate information from a child. And Calhoun denied all allegations. The jury found Calhoun guilty of first-degree sodomy and first-degree sexual abuse and acquitted him of unlawful use of an electronic device to induce a minor to engage in sexual acts. The jury recommended a sentence of thirty years' imprisonment. The trial court entered judgment accordingly.

## II. ANALYSIS.

### A. Trial Court's Refusal to Disqualify Entire Commonwealth's Attorney's Office was not Erroneous.

At the initial arraignment, the trial court appointed Emily Wilkey of the Department of Public Advocacy to represent Calhoun. And for roughly nine months, Wilkey represented Calhoun, appearing in court on his behalf eight times. Wilkey ended her employment with the DPA and accepted employment with the same Commonwealth's Attorney who was prosecuting Calhoun. Before trial, Calhoun—with the assistance of new counsel from DPA—filed a motion to disqualify the entire Commonwealth's Attorney's office. The trial court denied his motion. Calhoun now alleges this was an error by the trial court that warrants reversal of the judgment. His argument fails under the express terms of our rules.

3

Our own case law provides the primary support for Calhoun's disqualification argument: *Whitaker v. Commonwealth.*[3] In Calhoun's estimation, *Whitaker* not only supports his argument but mandates disqualification of the entire Commonwealth's Attorney's office. Admittedly, *Whitaker* involved similar facts: after beginning a defendant's representation, a public defender resigned and immediately took a position with the Commonwealth's Attorney. The trial court denied Whitaker's motion to disqualify the entire Commonwealth's Attorney's office, relying primarily on the prosecutor's assurances that no communication about Whitaker's case had occurred with Whitaker's former counsel. On appeal, while reversing Whitaker's conviction on other grounds, a majority of this Court rejected the trial court's handling of Whitaker's former defense counsel's working for the prosecution.

The majority in *Whitaker* began its analysis by acknowledging that our precedent supported the trial court's denial of blanket disqualification. Whitaker had failed to show any actual prejudice stemming from his counsel's transitioning to the Commonwealth's Attorney's office, and this failure alone was sufficient to sustain the trial court's decision. This was true, the Court reasoned, because under *Summit v. Mudd*[4]—relatively new precedent at the time of *Whitaker*—the movant must demonstrate actual prejudice for a blanket disqualification. And *Mudd* held that more than the mere appearance of impropriety was required to disqualify an entire prosecuting office: "actual prejudice must be shown before the Commonwealth['s] Attorney's entire staff is

---

[3] 895 S.W.2d 953 (Ky. 1995).
[4] 679 S.W.2d 225 (Ky. 1984).

4

disqualified. The mere possibility of the appearance of impropriety is not sufficient to disqualify the entire staff of the Commonwealth['s] Attorney's office From further prosecution of the case."[5] But the majority in *Whitaker* found the *Mudd* standard inadequate.

According to the majority in *Whitaker*, our rules governing the ethical practice of law and the Sixth Amendment to the United States Constitution required a departure from *Mudd*. In particular, Supreme Court Rule (SCR) 3.130-1.11(c)(1)[6] required that the public defender transitioning to the prosecution be disqualified from working on Whitaker's case.[7] But the Commentary to SCR 3.130-1.11 specifically rejected the notion that this individual disqualification should be imputed to the entire office: "Paragraph (c) *does not disqualify other lawyers in the agency with which the lawyer in question has become associated.*"[8] The majority in *Whitaker*, dismissing the Commentary as nonbinding, decided to ignore this language.

After "consider[ing] this matter at length," the Court—with no citation of authority—credited the Sixth Amendment for the principle that "careful inquiry by the trial court and disqualification of the entire office of the Commonwealth's Attorney" was required "if the attorney . . . engaged in a substantial and personal participation in the defendant's case."[9] The majority

---

[5] *Id.* at 225.

[6] Later amendments have changed the numbering of SCR 3.130-1.11. What was once SCR 3.130-1.11(c)(1) is now found in SCR 3.130-1.11(b).

[7] While not before the Court, we should be clear: Wilkey—the attorney who formerly represented Calhoun—is certainly disqualified from *any* participation, no matter the degree, in Calhoun's prosecution.

[8] *Whitaker*, 895 S.W.2d at 956 (quoting SCR 3.130-1.11 cmt. 9 (1989)) (emphasis added).

[9] *Whitaker*, 895 S.W.2d at 956.

5

in *Whitaker*, in essence, announced a per se rule of disqualification of not just the attorney who transitioned from defense counsel to prosecution, but the entire staff of the prosecutor's office as well. With the holding in *Whitaker*, we stand alone among the states in our interpretation of SCR 3.130-1.11, which, like similar rules in the majority of states, was modeled closely after the American Bar Association's Model Rules.[10] And the Sixth Amendment does not support *Whitaker*'s conclusion.[11]

In the end, *Whitaker* ended *Mudd*'s plain standard and limited its precedential value. But we amended SCR 3.130-1.11 in 2009 and eliminated much of the confusion spawned by *Whitaker* regarding wholesale imputation of disqualification to entire government offices. SCR 3.130-1.11(b), in its current form provides:

> [A] lawyer who has formerly served as a public officer or employee of the government . . . shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.
>
> When a lawyer is disqualified from representation under paragraph (a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter

---

[10] *See United States v. Huff*, 2002 WL 1856910 at *3 (W.D.Ky. Aug. 13, 2002) (compiling cases); *see also* John Wesley Hall, Jr., *Professional Responsibility in Criminal Defense Practice*, § 13:12 n.9 (3d ed.) ("The majority rule, however, does not require disqualification of the entire prosecutor's office *if* the screening measures can be adequate.").

[11] The Sixth Amendment guarantees a defendant will have conflict-free counsel. But it does not entitle a defendant to blanket disqualification of the prosecutor's office absent a showing of actual prejudice. *See Huff*, 2002 WL 1856910 at *3 ("Federal courts have uniformly concluded that where an attorney leaves private practice for service in government, absent a showing of actual prejudice the Sixth Amendment does not mandate the disqualification of other government lawyers in the new office from handling matters in which that attorney was involved in his former practice."). In any event, Calhoun was not represented by counsel with a conflict of interest nor prosecuted by one.

6

*unless*: (1) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom.

More directly, a former government attorney must be disqualified from matters involving a prior representation. But the entire office in which that attorney works is *not* disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.

Under our current rules, a government attorney who transitions from defense to prosecution may be screened from the case in which she was formerly involved. We should note that, especially in situations such as presented here, great pains should be taken to ensure no confidential information is gathered from a defendant's former counsel[12] and the former counsel is not given any opportunity, no matter how small, to participate in the action.

We hesitate to offer any bright-line rule for such situations as Calhoun presents. But, we should clarify the proper analysis. The majority in *Whitaker* held the trial court's focus should be on whether the attorney sought to be

---

[12] The release of confidential information obtained through previous representation would, first and foremost, violate a defendant's attorney-client privilege; a privilege that is at the very heart of the legal profession. But, more than that, dissemination of such information would also be an ethical violation subjecting the attorney to discipline. SCR 3.130-1.9 prohibits disclosure of information obtained in prior representation: "A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter: (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when information has become generally known; or (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client."

disqualified played a personal and substantial role in the defendant's representation. Perhaps that is correct when determining whether to disqualify *that* attorney. But that focus offers little with regard to whether an entire prosecutor's office should be disqualified. In making that determination, a trial court should instead focus on whether the screening procedures are appropriate and adequate. The Wyoming Supreme Court offered a series of guidelines for what appropriate screening procedures may look like in these circumstances, and we find them illustrative going forward:

1. Oral and written directions must be given to all staff members that the attorney will not participate in any matter in which the attorney participated as a public defender or criminal defense attorney. A written screening policy must be put in place to ensure this requirement is met.
2. A letter should be directed to every former client of the attorney announcing the new employment relationship. This letter may be sent to the client, care of the client's current attorney. Ideally, this letter should appear in the court record of an affected criminal case.
3. The prosecuting attorney's screening policy should be sent to every judge in the district, circuit, and/or county affected.
4. A copy of the screening policy should be placed in every active case file in which the attorney participated.
5. All office employees should be advised both orally and in writing that any violation of the screening process must be reported immediately and that inattention to the screening policy will result in discipline.
6. In a prominent location near case files, post a list of all cases from which the attorney is to be screened.[13]

There is no evidence that Wilkey participated at all in Calhoun's prosecution. So evidence of actual prejudice is absent. We cannot say Calhoun was substantially prejudiced by Wilkey's employment with the Commonwealth's Attorney's office. There has not even been an appearance of

---

[13] *Johnson v. State*, 61 P.3d 1234, 1243 (Wyo. 2003).

impropriety presented. The trial court was correct in not disqualifying the entire Commonwealth's Attorney office.

Calhoun's case fits neatly within the language of SCR 3.130-1.11. All indications are that Wilkey was appropriately screened from Calhoun's prosecution. The trial court did not abuse its discretion in allowing the prosecution to proceed. Neither the earlier or current version of SCR 3.130-1.11 supports a per se rule of disqualification for an entire prosecution office after a simple showing of substantial and personal participation in the defendant's case. What little that remained of the rule in *Whitaker* after our 2009 amendment to SCR 3.130-1.1 is now overruled. The trial court here did not act erroneously.

## B. The Commonwealth's Cross Examination of Rachel's Mother Was Not Error.

Calhoun argues his conviction should be reversed because the trial court erroneously refused to admonish the jury on a series of questions posed by the Commonwealth to Rachel's mother regarding a heated exchange she had with police. This encounter led to Rachel's mother's arrest. In Calhoun's view, this line of questioning was improper, and the trial court should have admonished the jury to disregard the exchange.

Rachel's mother testified that she thought Rachel had concocted the story of the sexual encounter with Calhoun. She believed the questioning by the police was improper, particularly the failure of the interrogator to repeat the questions to allow inconsistencies in Rachel's account to surface. Rachel's mother herself was sexually abused as a child. On cross-examination, the Commonwealth asked Rachel's mother about her own abuse and whether that

abuse had resulted in a hostility toward social-service workers investigating Rachel's claims. Rachel's mother claimed she was not now nor had she been hostile toward social-service workers. Rachel's mother proclaimed she did not believe in hostility.

Following up on her renunciation of hostility, the Commonwealth asked Rachel's mother if she recalled when the police came to serve a subpoena on her and she threatened to sic the dog on them. Before Rachel's mother could answer the question, the Commonwealth added: "That resulted in you being arrested and charged with a crime that day?" Calhoun timely objected to the question and argued the testimony was irrelevant and prejudicial. In the end, the trial court sustained Calhoun's objection and told the Commonwealth to refrain from questioning Rachel's mother about her arrest. The Commonwealth was permitted to inquire about the events that led to the arrest. The trial court also agreed to Calhoun's request for an admonition, but, for reasons unknown, failed to admonish the jury. Calhoun alleges both the questioning and the failure to admonish are reversible error.

As a general rule, our evidentiary rules prohibit the use of an individual's prior conduct or character to support his current conduct. "Evidence of other crimes, wrongs, or acts . . . to prove the character or a person in order to show action in conformity therewith."[14] Evidence of this nature can be admitted, however, if used for "another purpose" such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." As we have mentioned numerous times, this list of other purposes is

---

[14] Kentucky Rule of Evidence (KRE) 404(b).

10

not exhaustive. The point is the prior-bad-acts evidence must be offered for some reason other than simply to say that because an individual's past conduct determines present guilt.

As for character evidence: "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." The relevant exceptions to this rule can be found in provisions KRE 607, 608, and 609—in other words, character or credibility of a witness or a defendant can be impeached. Under these provisions, like prior bad acts, character evidence is admissible for various other purposes. Particularly relevant here, specific acts of conduct are contemplated as a permissible means of impeaching the credibility of a witness.[15]

We say this to highlight that Calhoun's challenge to the Commonwealth's questioning falls flat. Rachel's mother claimed she was not hostile toward authority or social-service workers, despite her belief that they mishandled not only Rachel's investigation, but hers as well. In an attempt to impeach Rachel's mother's credibility, the Commonwealth presented evidence that indicated she was, in fact, hostile toward authority. Rachel's mother denied the altercation. That was the end of the questioning. This is, in essence, routine cross-examination. The Commonwealth was not permitted to introduce extrinsic evidence of the alleged interaction or if a conviction had resulted. Instead, the Commonwealth simply inquired about an alleged incident that contradicted a witness's statement; the witness denied it; and testimony

---

[15] *See* KRE 608.

11

proceeded on a different path. The Commonwealth was not introducing evidence of a prior bad act or poor character to prove that Rachel's mother acted in conformity therewith; the evidence was offered to show that perhaps Rachel's mother's truthfulness was questionable.

The primary message of Rachel's mother's testimony was that she did not believe Rachel was truthful and she discounted the way the official investigation and questioning was handled. Evidence that Rachel's mother was hostile toward authority or had a deep mistrust of social-service workers was relevant to indicate a potential bias for her testimony.

The trial court agreed to admonish the jury about the Rachel's mother's arrest and criminal charge. We can appreciate the prudence. Calhoun now argues that the trial court did not deliver the admonition and his trial was severely tainted as a result. But Calhoun fails to mention why he did not remind the trial court of the admonition. In any event, we are not sure how the trial court would have admonished the jury. Rachel's mother never answered the question about her arrest or criminal charge, so there was no evidence on which an admonition could be based. To the extent there was any error, it was harmless. The verdict was not swayed by this line of questioning.

### III.   CONCLUSION.

Finding no error, we affirm the judgment of the trial court.

All sitting. All concur.

12

COUNSEL FOR APPELLANT:

Steven Jared Buck
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Kenneth Wayne Riggs
Assistant Attorney General of Kentucky