# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$

FINAL

2018-SC-000124-MR

DATE 4/4/19 Kim Redmon, DC

JIMMY DAVIS                                                    APPELLANT

ON APPEAL FROM MCCRACKEN CIRCUIT COURT
V.                    HON. WILLIAM A. KITCHEN III, JUDGE
NO. 16-CR-00102

COMMONWEALTH OF KENTUCKY                              APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Jimmy Davis was convicted by a McCracken County jury of rape, first degree; sodomy, first degree; possession of drug paraphernalia; unlawful transaction with a minor, second degree; possession of marijuana; and unlawful imprisonment, second degree. The jury recommended a total sentence of forty-five years and the circuit court sentenced Davis accordingly. Davis now appeals his conviction as a matter of right; he alleges that the trial court erred in (1) failing to disqualify the McCracken County Commonwealth's Attorney's office and (2) improperly limiting his cross-examination of witnesses, thereby restricting his ability to present a full defense. For the following

reasons, we affirm in all respects the judgment and sentence of the McCracken Circuit Court.

## I. BACKGROUND

Rosemary,[1] then fourteen years old, had known Davis her whole life. In fact, she referred to him as "Uncle Jimmy;" he was a family friend of her parents. In 2015, Rosemary had a cheerleading accident which led to a diagnosis of chronic pain, as well as fibromyalgia. Since that time, Rosemary has struggled with constant pain. She admitted that during the time of the incident underlying this case, she sought illicit drugs from others to alleviate this pain. Davis told her that he could get her pain pills if she needed them.

On December 17, 2015, Rosemary called Davis to help her get pain pills. He told her he would not be able to get the pills till the next day. On December 18, 2015, Rosemary met Davis at an abandoned restaurant down the street from her home. Per Davis's instructions, she deleted the text messages from him on her phone, turned off her phone so her mother could not track them, and left the phone in a hiding place at the restaurant. He then drove her to his home. In the car ride there, he gave her half a pain pill that he did not specifically identify and shared a marijuana cigarette with her. He told her that he had cancer "in his area," and required surgery to have "it removed."

When they arrived at his house, he showed her to the back room where he laid cocaine out on a white glass plate. He snorted some with a cut straw

---

[1] We utilize the pseudonym used by the parties in their briefing to this Court, in accordance with our procedures, to protect the privacy of the victim in this case.

2

and instructed her to do the same. She did. He then told her that they needed to go to his sister's home where Rosemary would need to help him find the pills. They arrived at the house and he took her to the bedroom and told her to start searching drawers for the pills.

While she was searching he walked out of the room. He walked back in and asked Rosemary if she wanted to "give him his last chance at manhood." Rosemary testified that she knew he meant he wanted to have sex and she told him no. He then said, "I didn't want to have to do this." When she turned back around again, he had a gun. He showed her that it was loaded and ordered her to undress. He had brought a plastic bag with the gun, duct tape, rope, and a razor blade. He tied her hands with the duct tape and rope and tied her to the bedpost. He forced her to perform oral sex on him and performed oral sex on her. He then attempted to penetrate her vaginally with his penis but was unable to become fully erect. Rosemary begged him to stop and he became angrier and angrier. He said that he was not able to "get fully hard" because of the cocaine. He then used his fingers to guide his penis inside her but was never able to ejaculate. While he continued to force himself upon Rosemary, he told her that if he couldn't have her mom, he would have her, that she looked just like her mother, and he had been waiting so long to do this.

Eventually, Davis removed himself from Rosemary, cut her bindings with a razor blade, and forced her to clean herself out. He drove her back to the restaurant. He told her he knew she was going to "tell on him," and repeatedly

3

apologized. She assured him that she would not tell. When they arrived at the restaurant, Rosemary recovered her phone and ran home. Rosemary was eventually transported to the hospital via ambulance and underwent an examination by a Sexual Abuse Nurse Examiner (SANE). Rosemary identified several items in the house to investigators, including a blanket Davis placed on the bed before he raped her, that were later recovered using her description. The duct tape was also found in Davis's home. Photographs were taken of injuries on Rosemary's wrists from where she had been restrained.

The jury convicted Davis of: first-degree rape; first-degree sodomy; second-degree unlawful transaction with a minor; second-degree unlawful imprisonment; possession of drug paraphernalia; and possession of marijuana. The jury recommended twenty years on both first-degree rape and first-degree sodomy, five years on second-degree unlawful transaction with a minor, twelve months on second-degree unlawful imprisonment, six months on possession of drug paraphernalia, and thirty days on possession of marijuana. The jury recommended that the felony sentences be served consecutively for a total 45-year sentence. The court sentenced Davis according to the jury's recommendation.

## II.     ANALYSIS

### A.     THE TRIAL COURT DID NOT ERR IN DENYING DAVIS'S MOTION TO DISQUALIFY THE MCCRACKEN COUNTY COMMONWEALTH ATTORNEY'S OFFICE.

Davis was appointed representation from the Paducah Trial Office of the Kentucky Department of Public Advocacy (DPA). He was originally tried in

4

April 2017, ending in a mistrial, and then tried again in November of that same year. During both trials, Robin Irwin personally represented Davis. However, between the first and second trials, another public defender, Douglas Moore, transitioned from the Paducah DPA office to the McCracken County Commonwealth Attorney's office. During the first trial, Moore had worked in the Paducah DPA office. Prior to the second trial, Moore went to work at the McCracken County Commonwealth Attorney's office. He never personally represented Davis at any point nor did he personally participate in Davis's prosecution. However, Davis asserted in his motion to disqualify the entire McCracken County Commonwealth Attorney's Office that Moore "worked closely and consulted with [Irwin] on many cases, especially those cases headed for trial." Davis's motion alleged that "Moore participated personally and substantially in this matter by consulting with [Irwin] on various aspects of the case."

The trial court heard argument on the motion. Notably, neither party presented affidavits, testimony, or other substantive proof on the motion. Davis argued that Irwin had discussed Davis's case with Moore and allowing the McCracken County Commonwealth Attorney's office to continue to prosecute the case while Moore worked there was unfair and violated Davis's constitutional rights. In response, the Commonwealth argued that there must be a showing of actual prejudice to disqualify the office. The prosecutor on Davis's case, Leigh Ann Dycus, stated, both in her response to the motion and at the hearing, that Moore had been properly screened from the case, the file

5

and pleadings were kept in the trial prosecutor's office, and Moore had "not reviewed the file or been privy to discussions about the case." At the hearing, she also noted that Moore would leave the room when Davis's case was discussed during office meetings.

The circuit court denied Davis's motion. Citing to *Calhoun v. Commonwealth*, 492 S.W.3d 132 (Ky. 2016), the court determined that the relevant standard is actual prejudice. The judge made a factual finding that there had been adequate screening. The court also noted that if this circumstance was sufficient to disqualify the entire Commonwealth Attorney's office, then it would have to be disqualified from every case active during the time Moore was employed at the DPA.

### 1. Standard of Review

A trial court's decision to deny or grant a motion to disqualify a prosecutor's office is subject to review for abuse of discretion. *See Barnett v. Commonwealth*, 979 S.W.2d 98, 102 (Ky. 1998). Under this standard, we decide "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Mason v. Commonwealth*, 559 S.W.3d 337, 339 (Ky. 2018) (quoting *Lopez v. Commonwealth*, 459 S.W.3d 867, 972-73 (Ky. 2015)).

### 2. Statutory disqualification

Kentucky Revised Statute (KRS) 15.733 provides that "[a]ny prosecuting attorney shall disqualify himself in any proceeding in which he or his spouse, or a member of his immediate family whether individually or as a fiduciary ...

6

[h]as served in private practice or government service, other than as a prosecuting attorney, as a lawyer or rendered a legal opinion in the matter in controversy." KRS 15.733(2). The statute also provides that "[a]ny prosecuting attorney may be disqualified by the court in which the proceeding is presently pending, upon a showing of actual prejudice." KRS 15.733(3).

There are multiple avenues of disqualification pursuant to this statute. The statute lists several specific grounds for disqualification, including the portion cited ("[h]as served in private practice or government service, other than as a prosecuting attorney, as a lawyer or rendered a legal opinion in the matter in controversy"). But, there is also a catch-all provision that allows for disqualification if there is "actual prejudice." *See* KRS 15.733(3). "A prosecuting attorney may be disqualified upon a showing of actual prejudice." *Clayton v. Commonwealth*, 786 S.W.2d 866, 869 (Ky. 1990) (citing KRS 15.733(3)).

The statutory disqualification here, upon Davis's motion, seems to disqualify Moore from any sort of participation in Davis's prosecution. According to attorney Irwin, Moore did "render[] a legal opinion" in this matter when Irwin and Moore discussed the case and trial strategy. The Commonwealth did not rebut this claim, instead relying upon the fact that Moore was appropriately screened from the prosecution. Thus, it seems consistent that the prosecuting office also deemed that Moore was disqualified from any participation in this prosecution pursuant to statute.

### 3. Ethical disqualification

Additionally, ethically, an attorney must withdraw from representation if there is a conflict of interest that prevents that representation. Kentucky Supreme Court Rule (SCR) 3.130(1.11) provides that "a lawyer who has formerly served as a public officer or employee of the government ... shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation." SCR 3.130(1.11(a)). Additionally, "a lawyer currently serving as a public officer or employee ... shall not ... participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment, unless the appropriate government agency gives its informed consent, confirmed in writing." SCR 3.130(1.11(d)).

The requirements under the ethical rule, in contrast to part of the statutory rule, do not require a showing of actual prejudice. Instead, it merely requires that the attorney in question "participated personally and substantially" in the matter during the previous employment in question. Thus, clearly under the plain language of this rule, any public defender who represented a defendant and then moved to the Commonwealth's Attorney's office could not participate in the prosecution of that defendant in that matter.

It is questionable to this Court whether Davis even made any preliminary showing that Moore "participated personally and *substantially*" in Davis's

defense. Irwin presented one email to the trial court showing he had sent an agreed stipulation to Moore but did not cite any specific conversations regarding trial strategy or case-specific issues. However, because Moore was clearly statutorily disqualified here, we must still reach the question of whether that disqualification is imputed to the entire office. Thus, we decline to delve further into whether Davis made a sufficient preliminary showing of personal and substantial participation to require disqualification under SCR 3.130(1.11), or what such a showing generally requires.

### 4. Imputation of any disqualification

The Supreme Court commentary to SCR 3.130(1.11), however, specifically noted: "Because of the special problems raised by imputation within a government agency, paragraph (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees, although ordinarily it will be prudent to screen such lawyers." We see no reason why the concerns related to ethical disqualifications would not extend to statutory disqualifications. We, therefore, hold that the same analysis is necessary to determine whether the statutory disqualification extends to the entire prosecuting office. We must, then, examine further our precedent on the imputation of ethical disqualifications in prosecuting offices.

Our Court has held:

[A] former government attorney must be disqualified from matters involving a prior representation. But the entire office in which that attorney works is *not* disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire

9

prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.

*Calhoun*, 492 S.W.3d at 137. We noted that "great pains should be taken to ensure no confidential information is gathered from a defendant's former counsel[] and the former counsel is not given any opportunity, no matter how small, to participate in the action." *Id.* (footnote omitted). In determining whether the entire prosecuting office should be disqualified, "a trial court should [] focus on whether the screening procedures are appropriate and adequate." *Id.*

In *Calhoun*, there was no evidence presented that the former public defender participated in the prosecution. *Id.* at 138. "So evidence of actual prejudice is absent." *Id.* The Court noted that "[a]ll indications" were that the former public defender "was appropriately screened from Calhoun's prosecution." *Id.* The Court specifically stated that the rules of professional conduct did not "support[] a per se rule of disqualification for an entire prosecution office after a simple showing of substantial and personal participation in the defendant's case." *Id.*

"[F]ederal courts have unanimously held that one prosecutor's bias does not automatically infect every other member of the prosecutorial office." *Commonwealth v. Ryan*, No. 2002-SC-0852-MR, 2002-SC-0866-MR, 2003 WL 22415751, at *5 (Ky. Oct. 23, 2003) (citing *United States v. Vlahos*, 33 F.3d 758, 763 n.5 (7th Cir. 1994) (quoting *United States v. Caggiano*, 660 F.2d 184, 191 (6th Cir. 1981))). "Indeed, these courts have noted that a blanket

10

disqualification of an entire prosecutorial office without a showing of actual prejudice offends the doctrine of separation of powers." *Ryan*, 2003 WL 22415751 at *5 (citation omitted); *see also Mahmoud v. Commonwealth*, Nos. 2006-CA-001838-MR and 2006-CA-001903-MR, 2009 WL 960721, at *12 (Ky. App. Apr. 10, 2009) ("Without a showing of actual prejudice, the trial court properly denied the motion to disqualify [the Commonwealth's attorney] and his office from the prosecution.").

Screening procedures are important and relevant to a trial court's inquiry into imputation of a disqualification. However, this importance is because proper screening procedures *prevent* actual prejudice. Thus, if a defendant can show that those screening procedures were inadequate to keep the former public defender from providing confidential information on the case or having any effect on the prosecution, it is relevant to show that the prosecutor's office did not fulfill its duty in appropriately screening that attorney from the case. However, absent that actual prejudice, we cannot hold that an entire prosecutor's office is disqualified from prosecuting the case. Such would be a potential overreach into the executive branch of government, although such a holding would be arguably constitutionally permissible given the Supreme Court's jurisdiction and power over the *practice* of law. We caution prosecutors' offices that screening procedures are essential in preventing these issues and the appearance of impropriety, as well as ensuring fair proceedings and protecting the due process rights of defendants.

11

Here, Davis made no showing of actual prejudice. His attorney's statements to the court were sufficient to meet the disqualification standard for Moore himself. We note briefly Davis's argument that there was no sworn testimony as to the screening procedures in place at the prosecutor's office and his ensuing argument that the failure to hold an evidentiary hearing was a violation of due process. However, Davis also presented no sworn testimony substantiating his claim for even disqualifying Moore. Thus, if the representation to the court by the prosecuting office was insufficient, then, arguably, the representations made by defense counsel to verify the motion were also insufficient. Pursuant to SCR 3.130(3.3), a lawyer is prohibited from knowingly "mak[ing] a false statement of fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Thus, if either defense counsel or the prosecuting attorney made such a false statement as to the grounds or response to a motion requiring disqualification, they would not only be subject to censure by the trial court but would also be subject to serious sanctions by the bar association. Consequently, unless there is an allegation that either attorney knowingly falsified this information before the trial court, we consider counsels' arguments on this issue sufficient for the trial court's ruling.

We do not limit the trial court's power to solicit sworn testimony, as necessitated by the motion, however. Davis argues that by failing to hold an evidentiary hearing (when neither party at that point requested the opportunity to submit substantive evidence such as witnesses or exhibits), the trial court

12

violated his due process rights. [2] "At its most basic level, procedural due process ensures that one is not unfairly deprived of his life, liberty, or property without receiving a hearing, adequate notice, and a neutral adjudicator." *White v. Boards-Bey*, 426 S.W.3d 569, 574 (Ky. 2014) (citing *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). The question then becomes whether the trial court's decision on the merits of the motion, based on unsworn argument from both counsel, was meaningful due process.

In *Gilbert v. Commonwealth*, we noted that, on the issue of competency to stand trial, "the Supreme Court of the United States has held that due process requires an evidentiary hearing whenever there is sufficient doubt of competency as to require further inquiry on the question." 575 S.W.2d 455, 456 (Ky. 1978) (citing *Drope v. Missouri*, 420 U.S. 162 (1975) and *Pate v. Robinson*, 383 U.S. 375 (1966)). "Kentucky protects this right by requiring such a hearing if there are reasonable grounds to believe the defendant is incompetent." *Gilbert*, 575 S.W.2d at 456 (citations omitted). Here, we find that Davis's due process rights were sufficiently protected. His motion failed to raise any "reasonable grounds" that would have required further evidence. Both attorneys were ethically obligated to be honest with the court, thus

---

[2] We also note a prior statement, in *dicta* from this Court: "An evidentiary hearing must be held and the trial court must carefully weigh the evidence suggesting bias on the part of the prosecutor's entire office." *Commonwealth v. Ryan*, No. 2002-SC-0852-MR, 2002-SC-0866-MR, 2003 WL 22415751, at *4 (Ky. Oct. 23, 2003) (citing *Summit v. Mudd*, 679 S.W.2d 225 (Ky. 1984) and *Whitaker v. Commonwealth*, 895 S.W.2d 953, 955 (Ky. 1995)). This case relied upon cases since overturned by *Calhoun*; however, to clarify, a trial court must hear and examine the merits of any motion to disqualify. However, the decision of what evidence to allow and the final decision on the motion is subject to an abuse of discretion standard.

providing more indicia of reliability than other unsworn testimony. Most importantly, Davis did not request an opportunity to present further *proof* and was then denied by the trial court. From our review of the hearing, defense counsel made a fleeting remark that the court needed to examine the screening procedures but did not make any request to call witnesses, present affidavits, or even require the same of the prosecution. Given the specific facts of Davis's case, we hold that his due process rights were protected.

Davis also argues that the Commonwealth's Attorney's Office was deficient in response to the motion to disqualify because it failed to: provide a list of cases in which Moore participated; present a written screening policy; send a letter to Moore's former clients; or send a screening policy to the trial judges. However, Davis attempts to create bright-line ethical rules, a laundry list of "musts," to meet the screening requirement. We decline to accept such a list of "to-dos." Instead, we leave it to the discretion of each trial judge to examine the facts of each situation and determine whether the screening procedures were adequate to prevent actual prejudice.[3] Indeed, trial judges are also imbued with the responsibility to report ethical violations should there be such proof presented.

Regardless, without further "special facts", there is nothing requiring disqualification of the entire prosecuting office. Davis has made no such

---

[3] Even if we looked to the screening procedures here as dispositive, the trial court made a factual finding that the screening procedures in this case were adequate. Such a finding is subject to clear error review. *See Oliphant v. Ries*, 460 S.W.3d 889, 897 (Ky. 2015) (citing *Miller v. Eldridge*, 146 S.W.3d 909, 915 (Ky. 2004)). Davis has presented nothing for us to find such error.

showing and the trial court did not abuse its discretion in denying the motion to disqualify the McCracken County Commonwealth's Attorney's office. Davis requests that this Court extend the holding of *Calhoun* and require the burden to shift to the prosecution to rebut a "presumption" of shared inter-office confidences between the former defender and current prosecutor. He argues that, based on Irwin's statements that he consulted with Moore, he has met his burden of proving Moore provided counsel on this case and it is now the Commonwealth's Attorney's *burden* to prove otherwise. We decline to make such a holding today. While we understand that other jurisdictions have adopted such a process, our precedent shows that the real concern in disqualifying an entire prosecuting office is *actual prejudice*. Thus, while it would behoove the Commonwealth to create and implement screening policies, and then provide those policies to their local DPAs and judges, we, at this time, decline to hold such as a *requirement*, and that it must be effectively *proven* to refute a motion to disqualify.

In conclusion, a defendant need not show actual prejudice as grounds for disqualification of a particular prosecutor under the specific statutory grounds in KRS 15.733 or under SCR 3.130(1.11). However, actual prejudice *must* be shown to substantiate disqualification of a particular prosecutor under KRS 15.733(3) or to impute the disqualification to the entire prosecuting office. Davis failed to meet the burden of proof on his motion to disqualify the entire McCracken County Commonwealth's Attorney's Office. We find no abuse of discretion in the trial court's denial of the motion.

15

## B.    THE TRIAL COURT DID NOT IMPROPERLY LIMIT DAVIS'S CROSS-EXAMINATION OF WITNESSES.

Davis conducted a lengthy cross-examination of Rosemary. Counsel asked Rosemary about: her relationship with her boyfriend, her sexual history with her boyfriend, how she had lied about her sexual history with that boyfriend in front of her mother, her drug use with her boyfriend and Davis, memory of the event, a "dream" she had that Davis was going to do this to her, the physical evidence, her memory of any identifying marks and tattoos on Davis's body, how she had deleted the messages with Davis off of her phone, the conflicting narrative her boyfriend gave about seeing her that day, and her attempt to steal pain pills. However, there were two specific facts to which the prosecution objected and the court prohibited the defense from inquiring further.

First, while questioning Rosemary about her drug use, defense counsel asked her if she used Adderall. Rosemary stated that she did not know what Adderall was. Defense counsel began to ask, "Have you ever posted on Facebook—" and the prosecution objected. At the bench conference, Davis argued that Rosemary had posted on her Facebook page, less than a month after the assault, that she was "getting high off of Adderall." Defense argued that this post was relevant to her ability to recall. The Commonwealth stated that the post actually consisted of song lyrics and was inadmissible character evidence. Rosemary had admitted to drug use so there was no relevance to this post. The circuit court sustained the objection, allowing the defense to ask Rosemary about use of Adderall on the day of the rape but no further.

16

Second, defense counsel asked Rosemary about Davis's identifying marks and tattoos. She confirmed that she told investigators that she was not really looking for identifying marks and could not clearly recall everything. She stated that she remembered a shoulder tattoo, that he may have had one on his chest, but was unsure of any others. In its case, the defense called Rosemary's mother, Charlotte, who had a previous relationship with Davis. Counsel asked her if Davis had any tattoos. She answered in the affirmative. Counsel then asked if Davis had a tattoo on his abdomen, above his penis. She said: "I don't— ... —not that I – I don't know. I don't know. I don't know." Defense counsel asked to approach the witness with a photograph; he wanted to show Charlotte a photograph, that had not been entered into evidence at any time or identified by anyone, of Davis's alleged abdomen area with this tattoo. The parties went to the bench. The prosecution argued, "She answered no, she doesn't know." Defense counsel stated he wanted to "refresh her memory." The court denied the request, stating defense was attempting to "introduce extrinsic evidence of a collateral matter" and the defense was "limited by [Charlotte]'s response."

Davis now argues that the trial court unconstitutionally limited his right to cross-examine witnesses against him. He claims both of these issues went to Rosemary's credibility as a witness.

A defendant "has a right under the federal Constitution (and the Kentucky Constitution as well) to 'a meaningful opportunity to present a complete defense.'" *Montgomery v. Commonwealth*, 320 S.W.3d 28, 41 (Ky.

17

2010) (quoting *Crane v. Kentucky*, 476 U.S.683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984))). This opportunity includes the "right to cross-examine the witnesses against him." *Montgomery*, 320 S.W.3d at 41 (citing *Davis v. Alaska*, 415 U.S. 308 (1974)). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974))).

However, "trial courts retain broad discretion to regulate cross-examination." *Yates v. Commonwealth*, 430 S.W.3d 883, 901 (Ky. 2014) (quoting *Bratcher v. Commonwealth*, 151 S.W.3d 332, 342 (Ky. 2004) (quoting *Commonwealth v. Maddox*, 955 S.W.2d 718, 721 (Ky. 1997))). "[A] trial court may, of course, impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant[.]'" *Olden*, 488 U.S. at 232 (quoting *Van Arsdall*, 475 U.S. at 679).

Despite this discretion, the defendant is entitled to "develop 'a reasonably complete picture of the witness'[s] veracity, bias and motivation.'" *Yates*, 151 S.W.3d at 342 (quoting *Bratcher*, 151 S.W.3d at 342). "Defendants cannot run

18

rough-shod, doing precisely as they please, simply because cross-examination is underway. So long as a reasonably complete picture of the witness' veracity, bias and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries." *Maddox*, 955 S.W.2d at 721 (quoting *U.S. v. Boylan*, 898 F.2d 230, 254 (1st Cir. 1990)). A defendant can show a violation of the constitutional right to cross-examine if "[a] reasonable jury might have received a significantly different impression of [the witness] credibility had [defendant's] counsel been permitted to pursue his proposed line of cross-examination." *Davenport v. Commonwealth*, 177 S.W.3d 763, 770 (Ky. 2005) (quoting *Van Arsdall*, 475 U.S. at 680). "The presentation of evidence as well as the scope and duration of cross-examination rests in the sound discretion of the trial judge." *Maddox*, 955 S.W.2d at 721 (quoting *Moore v. Commonwealth*, 771 S.W.2d 34, 38 (Ky. 1988)).

### 1. Rosemary's Facebook post mentioning Adderall

Davis was permitted to ask Rosemary about her extensive drug use. But he was not permitted to utilize a Facebook post to either impeach Rosemary's answer or refresh her memory of such drug use.[4] Utilizing the Facebook post to impeach Rosemary's answer about a specific instance of using Adderall would have been improper. "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence." Kentucky Rule of Evidence (KRE) 608(b). The Facebook post was also irrelevant to refresh her memory because she clearly

---

[4] Importantly, defense counsel asked Rosemary about her drug *use*, he had not yet asked her about ever *posting* about the drug, generally.

19

stated she did not know what Adderall was when asked if she had used it in the past. She was not asked about whether she had ever used the word "Adderall" in her Facebook posts. Thus, the post would not have been able to refresh her memory of any past use of the drug in question.

Davis also seems to argue that this Facebook post was substantively relevant, because it tended to show that Rosemary's memory was less than clear and she was not "credible". However, this argument must fail. The Commonwealth and Rosemary freely admitted that Rosemary had used drugs, both before and on the day of the incident. Thus, any additional effect that Adderall may have had on her memory a month later would have been cumulative, at best. Any argument that a post about Adderall bearing on Rosemary's truthfulness is hardly even tangential. Thus, even if the post was relevant as Davis argues, the trial court did not err in prohibiting him from further questioning this drug use with the Facebook post. The evidence would have been cumulative, repetitive, and marginally relevant; additionally, from the rest of the evidence, the jury's impression of Rosemary would not have been significantly altered by the introduction of this evidence.

## 2. The photograph of Davis's tattoo

First, we must note that Davis *was not prohibited* from *asking* about this particular tattoo. Defense counsel asked Rosemary what tattoos she remembered; he questioned her about whether her eyes were ever covered, leading to the insinuation that, if her recollection of events was accurate, she would have seen this tattoo. Rosemary openly stated that she could not recall

20

every mark on Davis's body. However, the problem arose because defense counsel had no substantive proof of Davis's tattoo. Davis chose not to exercise his right to testify. So, defense counsel attempted to prove the existence of this tattoo through Charlotte. But she stated she *did not know* of any such tattoo. The defense is bound by that answer. They could have attempted to introduce evidence of this tattoo another way, either through medical records, testimony of another party, or Davis's own testimony. But no such evidence was offered.

Thus, the right to cross-examine was not limited here, impermissibly or otherwise. Defense counsel simply did not like the answers given and wanted to use the opportunity to present substantive proof. The photograph in question was never authenticated. There was no way to let the jury know whether the photograph showed Davis. Charlotte did not say that she could not *recall* what Davis's naked body looked like; she stated that she did not know about this tattoo. There is a distinct difference and a photograph cannot "refresh the memory" of a witness who has unequivocally stated she does not know, nor has ever known, the answer to the question at issue. We find no error in the limitation of this line of questioning.

## III.   CONCLUSION

For the foregoing reasons, we affirm in all respects the judgment and sentence of the McCracken Circuit Court.

Minton, C.J.; Hughes, Keller, Lambert, VanMeter and Wright, JJ., sitting. All concur.

COUNSEL FOR APPELLANT:

Julia Karol Pearson
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Micah Brandon Roberts
Assistant Attorney General