# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: MARCH 19, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2025-SC-0016-MR

ANTHONY HALL · · · · · · · · · · · · · · · · · · · · · · · · · · · · APPELLANT

|  |  |
|---|---|
| V. | ON APPEAL FROM MENIFEE CIRCUIT COURT<br>HONORABLE ELIZABETH H. DAVIS, JUDGE<br>NO. 20-CR-00006 |

COMMONWEALTH OF KENTUCKY · · · · · · · · · · · · · · · APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Appellant Anthony Hall pleaded guilty in the Menifee Circuit Court to charges of kidnapping and murdering Jodi Stapleton, tampering with physical evidence, and abuse of a corpse. The trial court held a penalty phase jury trial, which resulted in a recommended sentence of life in prison. The trial court sentenced Hall in accordance with the recommendation. Hall now appeals to this Court as a matter of right. KY. CONST. § 110(2)(b). Following a careful review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2019, Appellant Hall and Jodi Stapleton began an on-again-off-again relationship. In December 2019, Stapleton sent text messages and photos of domestic abuse inflicted by Hall to her friend Ashley Stanley.

Stapleton continued to have a relationship with Hall. On March 26, 2020, Stapleton went to Hall's house. The following evening, the couple argued and violence erupted. Hall grabbed Stapleton from behind, threw her on the bed, punched her multiple times, restrained her in a chair with weed-eater string, hit her again, and taped a sock in her mouth to silence her. Stapleton's ribs and nose were broken, and she also suffered numerous head injuries that resulted in subdural hemorrhaging.

Hall left Stapleton restrained in the chair and fell asleep. When he awoke on March 28, 2020, he realized Stapleton was dead. He then "hogtied" Stapleton's body with electrical cords, wrapped it in a blanket and plastic, and placed it in his laundry room under trash bags and clothes.

On March 30, 2020, Hall contacted Tara Williams, a woman he had previously met on a dating site and invited her to his house. He met Williams in Morehead, where he used Stapleton's ATM card to withdraw money. He used some of that money to get his weed-eater out of pawn. Hall and Williams then went back to his residence where they attempted to have sex. Williams testified, however, that Hall "really couldn't keep it up." At the time Williams noticed the plastic bundle that concealed Stapleton's body but did not know what it was.

Hall then asked Williams to follow him in a truck to a friend's house so he could drop off a vehicle for the friend to borrow. The vehicle was Stapleton's Tahoe. Williams followed Hall "all over the place." Ultimately, while Williams was elsewhere, Hall burned the Tahoe at a remote location. Williams later

2

picked up Hall on the side of the road, and the two then went their separate ways.

Stapleton's family ultimately became suspicious of text messages that Hall was sending to them from Stapleton's phone purporting to be from Stapleton. Stapleton's mother and a relative went to Hall's home looking for her. Hall became worried they knew something was wrong and then fled the state.

On April 1, 2020, Hall was stopped by law enforcement in South Carolina for trespassing. He admitted to a South Carolina deputy that he had killed Stapleton. In an interview with a South Carolina detective, Hall admitted he had punched Stapleton several times, killed her, tied her up, tried to hide the body, and burned the Tahoe. In a later interview with Kentucky State Police detectives, Hall again admitted to murdering Stapleton. A search warrant was executed for Hall's residence, where law enforcement discovered Stapleton's body.

Hall was indicted for murder, kidnapping, tampering with physical evidence, and abuse of a corpse. Hall was initially represented for two years by a public defender. With that public defender as counsel, Hall entered a plea of guilty to the murder, kidnapping, and tampering charges in exchange for a sentence of thirty years. However, before final sentencing, Hall fired the public defender, retained private counsel, and moved to set aside his guilty plea. The trial court granted that motion.

While Hall's case remained pending, his former public defender became an Assistant Commonwealth's Attorney in the Menifee Commonwealth's Attorney's office. Hall therefore moved to disqualify that entire office from his case. At the hearing on the motion, Hall contended that the prosecution had been unduly "combative," which Hall believed was because his former public defender was familiar with Hall and was informing the prosecution's strategy. The prosecution responded that it had obtained an ethics opinion indicating disqualification of the entire office was not required, and that it had both orally and in writing put in place a screening process separating the former public defender from anything involving Hall's case. The trial court denied Hall's motion to disqualify the Commonwealth's Attorney's office, concluding there had been no showing of an actual impropriety and that the former public defender had been appropriately screened from Hall's case.

On the morning of his scheduled trial, Hall pleaded guilty to murder, kidnapping, tampering, and abuse of a corpse. The trial court then began a two-day penalty phase before a jury in which the jury heard testimony regarding the factual circumstances of the crimes at issue, among other information. Williams also testified to attempting to have sex with Hall in the laundry room where Stapleton's body was located, though Williams did not know at the time that the plastic bundle contained Stapleton's body. Stanley testified to having received the text messages and photos from Stapleton regarding Hall's domestic abuse of her. Stanley showed the texts and photos to the jury.

4

The jury recommended a sentence of life in prison, which the trial court imposed. Hall now appeals as a matter of right.

**ANALYSIS**

Hall raises three issues for our review: (1) whether the trial court erred in declining to disqualify the entire Commonwealth's Attorney's office; (2) whether a witness whom Hall contacted to assist him in disposing of the victim's vehicle could properly testify to other activities such as attempted sex; and (3) whether the trial court erred in admitting the text messages and photos relating to Hall's domestic violence against Stapleton a few months before the murder. We review each issue in turn, providing additional facts as necessary.

## I.    The Trial Court Did Not Err In Refusing To Disqualify The Entire Commonwealth's Attorney's Office.

Hall first argues that the trial court erred in refusing to disqualify the entire Menifee County Commonwealth's Attorney's office from Hall's prosecution. Hall contends such disqualification was warranted because his former public defender had become an Assistant Commonwealth's Attorney, and that the prosecution failed to prove it put in place adequate procedures to screen that former public defender from Hall's case. Hall preserved this allegation of error by his filing of a motion to disqualify, and we therefore review the trial court's ruling for an abuse of discretion. *Ward v. Commonwealth*, 587 S.W.3d 312, 319 (Ky. 2019) ("We review a trial court's denial of a defendant's motion to disqualify a prosecutor for abuse of discretion.").

When a former public defender accepts employment with a prosecuting office, the public defender must be disqualified from all matters in which he or

she was previously involved as a public defender.[1]  In such situations, "great pains should be taken to ensure no confidential information is gathered from a defendant's former counsel and the former counsel is not given any opportunity, no matter how small, to participate in the action."  *Calhoun v. Commonwealth*, 492 S.W.3d 132, 137 (Ky. 2016).  Thus, there is no question that disqualification of the former public defender from Hall's prosecution was mandatory, and that screening was required to ensure that he provided no confidential information or assistance to the work of the Commonwealth Attorney's office on Hall's case.

However, while an *individual* former public defender must be disqualified and screened from the prosecution of any case in which he or she was involved as a public defender, disqualification of the *entire* prosecuting office is not automatically required simply because the defendant's former public defender has accepted employment with that office.  *Id.*  Rather, disqualification of the entire prosecuting office is warranted only upon a showing of "special facts," such as the existence of actual prejudice or the prosecuting office's failure to use effective screening procedures:

---

[1] *See* Rules of the Supreme Court (SCR) 3.130(1.11)(a)(2) (prohibiting former government attorneys from "represent[ing] a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee" absent consent of the former employer); SCR 3.130(1.11)(d)(i) (prohibiting current government lawyers from participating in matters in which they previously "participated personally and substantially" absent consent); Kentucky Revised Statute (KRS) 15.733(2)(e) ("Any prosecuting attorney shall disqualify himself in any proceeding in which he . . . [h]as served in private practice or government service, other than as a prosecuting attorney, as a lawyer or rendered a legal opinion in the matter in controversy.").

> [A] former [public defender] must be disqualified from matters involving a prior representation. But the entire office in which that attorney works is *not* disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.

*Id.*

Hall contends that when a defendant seeks to disqualify an entire prosecuting office that has employed the defendant's former public defender, the prosecuting office should bear the burden of proving that disqualification is not warranted. We disagree. To the contrary, our case law establishes that a defendant seeking disqualification of an entire prosecuting office bears the burden of proving the "special facts," such as actual prejudice or the use of ineffective screening procedures, that warrant such a disqualification.

Indeed, in other analogous circumstances we have placed the burden of proof upon a defendant seeking disqualification of an entire prosecuting office. In *Ward*, for example, the Commonwealth's Attorney's office came into possession of recorded jail calls between the defendant and his counsel. 587 S.W.3d at 319. The defendant moved for disqualification of that office for violating his right to privileged attorney-client communications. *Id.* at 318. In considering whether the prosecuting office's conduct resulted in "actual prejudice" warranting disqualification, we favorably noted another jurisdiction's allocation of the burden of proof to establish such prejudice to the defendant:

> The burden is on Defendant to demonstrate that the circumstances of the taping of any privileged call from the jail constitute an affirmative action by the government to intrude

7

> into the attorney-client privilege, rather than an inadvertent recording of such a call . . . . Mere possession by the prosecution of otherwise confidential trial strategy information does not establish prejudice.

*Id.* at 324 (quoting *United States v. Guzman-Solis*, No. CR-14-01729-001-TUC-CKJ, 2015 WL 13283396, at *8 (D. Ariz. Oct. 19, 2015)). We then held that disqualification was not warranted because no evidence had been presented to support a finding of actual prejudice resulting from the Commonwealth's Attorney's possession of the privileged phone calls. *Id.* at 326 ("[N]o evidence suggests that defense strategy was communicated to the prosecutor. . . . [W]e find no abuse of discretion in the trial court's denying Ward's motion to disqualify the Commonwealth's Attorney's Office . . . ."). Though not involving a prosecuting office's employment of a former public defender as we are faced with here, *Ward* nonetheless placed upon the defendant the burden of proving actual prejudice warranting disqualification of the entire prosecuting office.

We find the reasoning of *Ward* equally applicable to the circumstances presented here, and thus conclude that when a defendant moves to disqualify an entire prosecuting office on grounds that his former public defender is now employed with that office, the defendant bears the burden of proving by evidence the "special facts," such as actual prejudice or ineffective screening procedures, warranting such a disqualification.

Here, Hall made no such showing. Indeed, Hall offered no evidence at all, instead relying solely on the fact that his former public defender had been employed by the prosecuting office, Hall's perception that the prosecution had been unduly combative, and his speculation that this was due to the former

8

public defender providing assistance to the prosecution of his case. These bare allegations fell far short of the evidentiary showing necessary to establish special facts, such as actual prejudice or ineffective screening procedures, warranting a disqualification of the entire prosecuting office.

We are also unpersuaded by Hall's contention that because he does not have inside access to the operations of the Commonwealth's Attorney's office, he would never be able to satisfy a burden of proving special facts warranting disqualification. To the contrary, a defendant seeking to establish facts warranting disqualification of a prosecuting office has at his disposal the ability to procure by subpoena the office's written screening policies or other non-privileged written materials relevant to the motion to disqualify. Where it appears the motion to disqualify raises concerns sufficient to warrant the holding of an evidentiary hearing, the defendant will also have the ability to obtain testimony pursuant to subpoena from prosecuting office employees regarding non-privileged matters relevant to the disqualification motion.

In sum, because Hall failed to meet his burden of proof, we perceive no abuse of discretion in the trial court's denial of his motion to disqualify the Commonwealth Attorney's office. This is particularly so given the representations of the Commonwealth's Attorney—who did not bear the burden of proof—to the trial court that written and oral screening policies were put in place to ensure the former public defender would not participate in or aid the prosecution of Hall, and that such participation or aid had not occurred and would not occur.

9

Finally, we also acknowledge that in *Calhoun*, we noted a number of relevant factors that may be relevant in determining whether a prosecuting office has adopted effective procedures to screen a prosecutor from a matter in which he or she previously served as a public defender. These factors include:

> 1) the providing of oral and written directions regarding the screen to all staff members, pursuant to a written screening policy;
>
> 2) the sending of letters to the prosecutor's former clients, ideally placed in the court record of the affected criminal case;
>
> 3) the providing of the prosecuting office's written screening policy to every affected judge;
>
> 4) the placing of the written screening policy in every active case file in which the prosecutor participated;
>
> 5) informing all employees, both orally and in writing, that any violation of the screen must be reported immediately, subject to discipline for failure to do so; and
>
> 6) the placing in a prominent place near case files of a list of all cases from which the prosecutor is to be screened.

492 S.W.3d at 137-38. However, these factors are not a laundry list of requirements that must be met in all cases to provide effective screening. Rather, it must be left to the discretion of the trial court to determine based upon the particular facts at issue whether screening procedures adequate to prevent actual prejudice have been adopted. Here, Hall made no showing that the prosecuting office's screening procedures were ineffective, and thus the trial court correctly denied his motion.

10

## II.   The Trial Court Did Not Err In Admitting Evidence Of Hall's Attempted Sexual Liaison With Williams.

Hall also argues that the trial court erred in admitting the testimony of Williams (the woman Hall called after the murder to assist in the disposal of the victim's vehicle) regarding Hall's unsuccessful efforts to have sex with her. Hall contends this evidence was not relevant to the sentencing matters at issue during the penalty-phase-only trial. He also contends this evidence was overly prejudicial. Hall preserved his allegation of error by objecting to the admission of this evidence at trial, and we thus review the trial court's ruling for an abuse of discretion. *Brown v. Commonwealth*, 723 S.W.3d 667, 672 (Ky. 2025) ("We review a preserved allegation of error in the admission of evidence for abuse of discretion.").

On the first day of trial, a detective testified that Williams was visible on video footage of Hall using Stapleton's ATM card to withdraw money after the murder, and that she had picked up Hall on the side of the road after he burned Stapleton's Tahoe. When the Commonwealth announced its intention to call Williams herself to the stand on the second day of trial, Hall objected that the detective had already testified to Williams' involvement in the crimes, Hall's confessions to law enforcement already described the crimes, and the only purpose of Williams' testimony was for the Commonwealth to present the jury with highly prejudicial and non-probative evidence that Hall attempted to have sex with Williams in the room with Stapleton's body. The Commonwealth responded that Williams' testimony about the crimes would differ from what Hall had stated in his confessions. The trial court overruled Hall's objection

11

because Williams' testimony was not merely repetitive and she was a material witness.

On the stand, Williams testified to Hall's withdrawal of cash from the ATM, her following of Hall in his vehicle as he drove the Tahoe to dispose of it, and Hall's failed efforts to have sex with her in the room where Stapleton's body was hidden because "he really couldn't keep it up." Hall contends the trial court erred in allowing Williams' testimony about the attempted sexual liaison because it was not relevant to the sentencing matters at issue in the penalty-phase-only trial.

As we have previously held, when a jury sits only to consider an appropriate penalty, "common sense dictates" that the jury must be provided with some evidence relating to guilt, "if they indeed are not 'to sentence in a vacuum without any knowledge of . . . matters that might be pertinent to consider in the assessment of an appropriate penalty.'" *Boone v. Commonwealth*, 821 S.W.2d 813, 814 (Ky. 1992) (quoting *Commonwealth v. Reneer*, 734 S.W.2d 794, 797 (Ky. 1987)) (emphasis removed). Such evidence may include the charges of which the defendant is guilty as well as the nature and factual details of the crimes at issue. *Id.* In addition, we have also found appropriate under such circumstances the admission of evidence relating to "background information on the crime," the defendant's explanation of what happened, and evidence relevant to "assessing aggravating and mitigating circumstances, both statutory and non-statutory." *St. Clair v. Commonwealth*, 319 S.W.3d 300, 312 (Ky. 2010). Ultimately, the trial court's guiding star in

12

considering the admissibility of evidence in a penalty-phase-only trial should be whether the information is relevant to inform the jury of the crimes, the defendant's guilt, and other matters directly relevant to the penalty to be imposed such as mitigating and aggravating circumstances and truth-in-sentencing matters, subject as always to the obligation to avoid the admission of unduly prejudicial evidence. *See* Kentucky Rules of Evidence ("KRE") 401, 403.

Here, Williams' testimony regarding Hall's unsuccessful efforts to have sex with her was relevant to his commission of the crimes of tampering and murder. Evidence is relevant if it makes an allegation even slightly more likely to be true than it would be without that evidence. *Brown v. Commonwealth*, 540 S.W.3d 374, 378 (Ky. 2018) ("It is enough if the item could reasonably show that a fact is slightly more probable than it would appear [w]ithout that evidence." (quoting *Turner v. Commonwealth*, 914 S.W.2d 343, 346 (Ky. 1996))). Williams' testimony established that she met Hall on a dating site. After killing Stapleton—and apparently while still needing assistance to dispose of her Tahoe—Hall reached out to Williams, who remained unaware of his crimes. He then met up with her, brought her to his residence, engaged in an unsuccessful effort to have sex with her, and then used her unwitting assistance in his disposal of Stapleton's Tahoe. These facts give rise to an inference that Hall's true purpose in reaching out to Williams was to solicit her unknowing assistance in destroying Stapleton's vehicle and thereby hiding his involvement in the murder. The evidence of Hall's unsuccessful sexual liaison

13

with Williams thus made it more likely that he destroyed Stapleton's Tahoe. Indeed, it was part and parcel of the apparent method by which he accomplished that crime—namely the procuring of a former romantic partner under a pretense of a sexual liaison. In turn, Hall's destruction of the Tahoe also made it more likely he had killed Stapleton, as it was evidence of his consciousness of guilt. Thus, because the unsuccessful sexual liaison was relevant to Hall's commission of the crimes of tampering and murder, it was admissible in Hall's penalty phase-trial.

We also do not conclude that the sexual liaison evidence was unduly prejudicial. KRE 403 allows the exclusion of evidence "if its probative value is substantially outweighed by the danger of undue prejudice." In considering whether evidence should be excluded under KRE 403, "a trial court must consider three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth." *Barnett v. Commonwealth*, 979 S.W.2d 98, 103 (Ky. 1998).

As noted above, Hall's failed sexual liaison with Williams was relevant to demonstrating that his true purpose in contacting her was to procure assistance with the destruction of Stapleton's Tahoe and thereby conceal his involvement in the murder. We acknowledge that Hall's effort to attempt to have sex with Williams in the room where he had stashed Stapleton's body in a plastic bag was also prejudicial. There is no denying that such conduct was abhorrent.

14

Nonetheless, we do not find that the harmful effects of that testimony substantially outweighed its probative worth so as to result in undue prejudice to Hall. While Hall received the maximum sentence possible, we cannot attribute that to the jury hearing about the failed sexual liaison when it also heard about a significant amount of far more horrifying conduct by Hall before that liaison ever occurred. Indeed, the gruesome nature of Hall's conduct was vividly apparent even before the jury heard about his unsuccessful attempt to have sex with Williams in the room where Stapleton's body was located. The jury heard that Hall had beaten Stapleton, tied her to a chair with weed-eater string, beat her further, stuffed a sock into her mouth, and then went to sleep while she remained injured and restrained and ultimately died. It is thus far more likely that the jury's imposition of the maximum sentence was the result of the gruesome nature of Hall's crimes rather than his unsuccessful sexual liaison with Williams. As such, while the evidence of Hall's attempted sexual liaison was admittedly prejudicial, we do not find it *unduly* prejudicial or that the trial court abused its discretion in declining to exclude that relevant evidence.

### III. The Trial Court Did Not Err In Admitting Text Messages And Photos Relating To Hall's Domestic Abuse Of Stapleton A Few Months Before The Murder.

Hall also contends the trial court erred in admitting text messages and related photos from Stapleton to her friend Ashley Stanley regarding Hall's domestic abuse against Stapleton a few months before the murder. Hall argues this evidence was not relevant to sentencing, and that the text

15

messages were also inadmissible hearsay.   These allegations of error were preserved by Hall's making of objections before the introduction of the evidence, and thus we consider whether the trial court abused its discretion in admitting that evidence.  *Brown,* 723 S.W.3d at 672.

At trial, the Commonwealth called Stanley to the stand.  The prosecutor asked Stanley if Stapleton had communicated with her regarding her relationship with Hall, and Hall objected that the elicited evidence would be inadmissible hearsay.  The prosecution responded that Hall told law enforcement he snapped after seeing texts from Stapleton to Stanley about the prior domestic violence.  Thus, the trial court concluded those texts were admissible because they did not go to the truth of the matter asserted, but rather to the effect they had on Hall.

Stanley then testified and showed the jury texts from Hall to Stapleton, which Stapleton had sent on to Stanley, in which Hall referred to not being able to control built-up anger, apologized for harming Stapleton and causing her pain, and said she "got the worst."  Stanley also showed the jury photos Stapleton had sent her of injuries to her neck and jaw that occurred because Hall "just freaked" after they were arguing.  Time stamps indicate these photos were from December 2019, a few months before the murder.

We first disagree that the text messages were inadmissible hearsay.  An out-of-court statement constitutes inadmissible hearsay only if it is offered to prove that the content of the statement itself is true.  KRE 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial

16

or hearing, offered in evidence to prove the truth of the matter asserted.").  An out-of-court statement that is not offered to prove that its content is true, but rather for some other purpose, is not hearsay.

Such was the case with the admission of Stapleton's text messages to Stanley.  The messages were not offered to prove that Hall had in fact committed domestic abuse against Stapleton as Stapleton stated in the messages to Stanley, but rather to corroborate Hall's assertion that he saw such messages on Stapleton's phone, "snapped," and killed her.  More particularly, the jury heard Hall's statements to law enforcement in which he asserted that he had seen text messages in which Stapleton told a friend Hall had hit her, that the cell phone was what set in motion the events leading to Stapleton's murder, and that he "snapped" and killed Stapleton.  As such, the text messages were admitted not to prove that Hall had previously committed domestic violence against Stapleton, but rather to corroborate his statements to law enforcement regarding the circumstances leading up to the murder.  Thus, because the messages were not offered to prove the truth of their content, they were not hearsay.

The text messages were therefore also directly relevant factual and background information regarding Hall's commission of the crimes, and thus admissible in his penalty-phase-only trial.  Indeed, Hall stated to law enforcement that he saw the messages, that the cell phone set the crime in motion, and that he "snapped."  As such, the messages were also information regarding the factual circumstances of the crimes admissible even in a penalty-

17

phase-only proceeding. Accordingly, we likewise perceive no abuse of discretion in the trial court's admission of that evidence.

In sum, we conclude that Hall failed to meet the burden of demonstrating that disqualification of the entire Commonwealth Attorney's office was warranted. We also find no abuse of discretion in the trial court's admission of evidence regarding Hall's attempted sexual liaison with Williams, as that evidence was relevant to his commission of the crimes at issue and was not unduly prejudicial. Finally, the trial court also did not abuse its discretion in admitting Stapleton's text messages to Stanley because the text messages were not offered to prove the truth of the matter asserted and were relevant to establishing the factual circumstances of the crimes.

## CONCLUSION

For the foregoing reasons, we affirm the judgment and sentence of the Menifee Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General

18